**Charles Warren POLLARD, Petitioner,**

v.

**Walter M. RIDDLE, Respondent.**

**Civ. A. No. 75–2208–R.**

United States District Court,
E. D. Virginia,
Richmond Division.

Dec. 28, 1979.

---

James W. Featherstone, III (court appointed), Richmond, Va., for petitioner.

Jerry P. Slonaker, Asst. Atty. Gen., Richmond, Va., for respondent.

## MEMORANDUM

MERHIGE, District Judge.

Petitioner, a Virginia prison inmate, brings this habeas corpus action under 28 U.S.C. § 2254 in which he attacks a 1960 state court conviction and a subsequent recidivist sentence based thereon. Jurisdiction is appropriate under 28 U.S.C. § 2241(a). The matter comes before the Court for a reconstructed waiver hearing whereby the Court must determine the propriety of the certification of petitioner, Charles Warren Pollard, as an adult for trial in the court of record which convicted petitioner in 1960.

The facts as found by the Court in an earlier opinion are as follows. In 1960, petitioner, then not quite 15 years of age, was arrested and charged in a petition filed in the Juvenile and Domestic Relations Court of King and Queen County, Virginia, with offenses which, if committed by an adult, could be punishable by confinement in the penitentiary. The charges against petitioner stemmed from the murder and robbery of petitioner's grandfather and the burning of the victim's house, all of which defendant confessed to while in police custody. The Juvenile Court ordered an investigation of petitioner's physical, mental and social condition as well as of the facts and circumstances surrounding the alleged offenses. The investigating agency recommended that petitioner be committed to the State, specifically for treatment at the Thorpe Home for Negro Boys, as there were in its view prospects for rehabilitation. Petitioner was represented by counsel and was accompanied by his parents at the hearing.

Notwithstanding the welfare agency's recommendation, the Juvenile Court certified the petitioner for trial as an adult by the Circuit Court of King and Queen County, Virginia. The certification order failed to specify any reasons for treating petitioner as an adult in light of the recommenda-

tion to the contrary. Petitioner was thereupon indicted for murder, arson, and grand larceny. When the indictments were presented, the Circuit Court entered an order purporting to confirm all that had been done by the Juvenile Court, including certification of the petitioner for trial as an adult. This order likewise omitted any specification of reasons for certification.

Petitioner was tried and convicted on the murder indictment. The Court then accepted petitioner's guilty pleas to the arson and larceny charges. The Circuit Court sentenced petitioner to a term of twenty years on the murder conviction, and five years for arson to run concurrent with a three year sentence imposed for larceny. These sentences were subsequently commuted to a total of twenty-four years. In 1969, petitioner was released on parole. In 1972, however, he was convicted of rape and sentenced to forty years. Following the rape conviction, petitioner's parole was revoked and he was given a recidivist sentence of two years, one year and three months of which were suspended during good behavior. Upon serving the rape sentence, petitioner must thereafter serve the recidivist sentence plus that portion of the 1960 King and Queen sentence remaining to be served upon revocation of parole.

Petitioner in this action attacks the 1960 King and Queen convictions. He contends that the failure of both the Circuit Court and the Juvenile Court to specify reasons for certifying him for trial as an adult denied him due process, requiring the voiding of both the King and Queen convictions and the recidivist sentence.

In an order and memorandum entered by this Court on October 11, 1977, it was found that the Juvenile Court's waiver of jurisdiction was constitutionally infirm due to the absence of a statement of reasons supporting such waiver as required by *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). Finding no remedial procedure available under Virginia law, the Court directed a hearing to be set to determine, *nunc pro tunc*, whether in light of all the information which might have been proffered at the original certification hearing, a reasonable juvenile court would have waived its jurisdiction. *See Kemplen v. Maryland*, 428 F.2d 169, 178 (4th Cir. 1970). The parties have stipulated the record for this purpose and have waived a formal evidentiary hearing.

The documents comprising the record for this determination include psychiatric and psychological reports, a social history of petitioner, his school report, and the Juvenile Court's written certification of petitioner to the Circuit Court. The Court finds this record a more than adequate reflection of all the information which might have been proffered at the original certification hearing.

## I.

The factors to be considered by the Court in this waiver determination include the offender's past record, mental health, motivation, prior opportunities for self-help, and the nature of the offenses with which he is charged. *Inge v. Slayton*, 453 F.Supp. 350, 353 (E.D.Va.1978). Perhaps the most difficult task involved here, however, is deciding which of the criteria suggested above, if any, should be accorded more importance than the others. Juvenile certifications are not characteristically cut and dried determinations, but involve a balancing of the child's interests with those of the state, resulting in resolutions of some rather uncomfortably close issues. The United States Court of Appeals for the Fourth Circuit in *Kemplen v. Maryland*, *supra*, stated that the district court must determine "*nunc pro tunc* . . . what the juvenile court judge would probably have done in light of all the information then available that might reasonably have been proffered by competent counsel." *Kemplen v. Maryland*, *supra* at 178. This Court, therefore, must weigh the evidence relevant to petitioner's certification in light of criteria which the Court finds a juvenile court judge on the bench in 1960 would have considered most important.

The Virginia statute under which the Juvenile Court certified petitioner to

the Circuit Court to stand trial as an adult did not provide criteria to be applied in weighing the evidence for certification. The relevant statute in 1960 provided as follows:

§ 16.1–176. Transfer to other courts; presentment to grand jury; children under fourteen excepted.—(a) If a child fourteen years of age or over is charged with an offense which, if committed by an adult, could be punishable by confinement in the penitentiary the court after an investigation as prescribed in paragraph (b) of this section, and hearing thereon may, in its discretion, retain jurisdiction or certify such child for proper criminal proceedings to the appropriate court of record having criminal jurisdiction of such offenses if committed by an adult; provided, however, that in the event the juvenile court does not so certify a child fourteen years of age or over, charged with an offense which, if committed by an adult, would be punishable by death or confinement in the penitentiary for life or a period of twenty years or more, the Commonwealth's attorney of the city or county, if he deems it to the public interest, may present the case to the grand jury of the proper court of record, and provided further that if a child fourteen years of age or older who has previously been adjudged to come within the purview of the juvenile and domestic relations court law for committing an offense indicating a viciousness of character, or an offense which, if committed by an adult, could be punishable by confinement in the penitentiary and is subsequently charged with committing a felony, the Commonwealth's attorney of the city or county, if he deems it to be in the public interest, may, after a preliminary hearing in the juvenile and domestic relations court, present the case to the grand jury of the proper court of record.
.   .   .

Va.Code § 16.1–176(a) (1950). The discretion lodged in the juvenile court was a sound judicial discretion, based upon knowledge of facts upon which the discretion might properly operate, and not to be exercised arbitrarily or capriciously. *See Tilton v. Commonwealth*, 196 Va. 774, 85 S.E.2d 368 (1955) (describing the discretion allowed a court of record in asserting jurisdiction over a juvenile or in transferring his case to the juvenile court).

Because Virginia, as most if not all other states, had no statutory provision requiring a statement of reasons for the certification of juveniles in 1960, it is difficult to ascertain what factors would have been considered in a waiver determination.

The Court does however find some guidance from relevant Virginia statutes and case law interpreting the juvenile laws. Sec. 16.1–140 of the 1950 Virginia Code stated that the juvenile laws should be construed liberally and as remedial, and that the welfare of the child was the paramount concern of the state. In practice, however, courts generally felt that the juvenile legislation recognized that cases involving serious, aggravated offenses required that the child be dealt with as an adult under the general criminal laws, and not as a minor under the methods and procedures established by the juvenile laws. *See Durrette v. Commonwealth*, 201 Va. 735, 113 S.E.2d 842 (1960). *See generally* 9B Michie's Jurisprudence, Infants § 13 at 481 (1977) and cases cited therein. The severity of the offense charged appears to have predominated as the primary criterion supporting a juvenile court's waiver of jurisdiction. Indeed, courts in states other than Virginia have held that waiver of a juvenile court's jurisdiction over a child may be premised solely on the basis of the seriousness of the offense. *See P. H. v. State*, 504 P.2d 837 (Alaska 1972); *Mikulovsky v. State*, 54 Wis.2d 699, 196 N.W.2d 748 (1972). *Contra, Jimmy H. v. Superior Court*, 3 Cal.3d 709, 91 Cal.Rptr. 600, 478 P.2d 32 (1970). This attitude, though not found in Virginia common law, is reflected in the current Virginia Code § 16.1–269, under which a child charged with murder, rape, or armed robbery may be certified without any consideration of rehabilitation potential, but premised solely on a finding that there is probable cause to believe the child commit-

ted the offense, that he is not mentally retarded or insane, and that the community interest requires certification as an adult.

■ This predominant concern for the seriousness of the offense is reflected in a survey, published in 1967 by the President's Commission on Law Enforcement and Administration of Justice, taken of 207 juvenile courts serving a population of 100,000 or over to determine the factors most frequently considered in a waiver determination. The survey revealed, among those factors most often cited, the following: (1) seriousness of the alleged offense, (2) aggressive, violent, premeditated, or willful manner in which the offense was committed, (3) evidence apparently sufficient for a grand jury indictment, (4) the juvenile's associates in the offense will be charged in adult court, (5) sophistication, maturity, emotional attitude of the juvenile, (6) juvenile's past history with the police, (7) more appropriate procedures for rehabilitation available in the adult court, (8) the possible need for a longer period of incarceration, (9) community attitude toward the offense, (10) proximity of juvenile's age to maximum age of juvenile jurisdiction, and (11) effect of judgment of waiver on public's respect for law enforcement and law compliance. President's Commission on Law Enforcement and Administration of Justice, Task Force Report on Juvenile Delinquency and Youth Crime, Appendix B, Table 5 (1967). See Note, *Juvenile Court Waiver: The Questionable Validity of Existing Statutory Standards*, 16 St. Louis V.L.J. 604, 611–12 (1972). Factors involving the type of offense charged, the manner of its commission, the public's attitude towards that crime, and the amount of evidence against the juvenile outweigh considerations of the juvenile's amenability to rehabilitation.

Similarly, the United States Supreme Court in 1966 suggested, after consultation with federal judges and representatives of the Bar in the District of Columbia, eight determinative factors to be considered in a waiver hearing under the District's Juvenile Court Act, D.C.Code § 11–914 (1951): (1) the seriousness of the offense and the need for community protection, (2) aggressive, violent, premeditated or willful manner by which the offense was committed, (3) whether the offense was against persons or against property, the former given greater weight, (4) the existence of probable cause to believe the juvenile committed the offense, (5) whether the juvenile's associates will be tried as adults in the same court, (6) the juvenile's sophistication and maturity, (7) the juvenile's prior history with police and the courts, (8) the likelihood of rehabilitation. *Kent v. United States, supra*, 383 U.S. at 566–67, 86 S.Ct. 1045. Mr. Justice Fortas, writing for the Court, emphasized that although consideration must be given to all of the factors listed above, not all will generally be involved in any single case. *Id.* at 567–68, 86 S.Ct. 1045.

The Court must therefore make its waiver determination in light of the somewhat homogeneous set of factors suggested by the statutes, cases, and surveys heretofore discussed.

II.

The record, as stipulated by the parties, reveals that on January 11, 1960, Deputy Sheriff W. Bernard Walton went to petitioner's home in response to a public service call advising that a private home had burned with a single victim inside. On arrival, Deputy Walton found the dwelling nearly totally destroyed by fire. In one corner of the house were the remains of a body lying face down in spread-eagle fashion on the floor. Only the floor directly beneath the body remained intact. The body was badly charred and the top portion of the skull was missing, leaving the inner skull and brains exposed.

An autopsy was ordered by the Sheriff's office. The autopsy report revealed that the victim had lead bullets lodged in his head, and that the victim's lungs contained no carbon monoxide, indicating that the subject had died before the house had burned. The Commonwealth's Attorney immediately instructed Deputy Longest of the King and Queen County Sheriff's Office to bring in the victim's three grandchildren

residing with him plus a neighbor, Robert Greene, for questioning. Once in police custody, all three grandchildren, including petitioner, confessed to the murder and robbery of their grandfather and to setting fire to his house.

From the children's confessions, it appears that the three had planned to kill their grandfather for several days prior to the crime, the motive apparently being a desire to move away from a grandparent perceived as too strict and a wish to live with their mother in Richmond. On the morning of the crime, petitioner took his grandfather's shotgun and proceeded outside the house to his grandfather's bedroom window. At this time, his grandfather, Willie Pollard, was seated directly in front of the window. Petitioner fired the shotgun through the window and shot his grandfather. Leaving their grandfather on the floor, the three boys then went into the kitchen to prepare breakfast for themselves. At this time, their neighbor Robert Greene arrived asking for the children's grandfather. Petitioner and his brothers told Greene that Willie had gone into the woods and was not available. They then fed Greene his breakfast and hurried him off to work.

Once Greene had gone, petitioner ordered one of his brothers to find some gasoline, which they subsequently poured around the victim's body. After taking some cash from their grandfather's person and a pistol owned by him, and while the youngest boy detained the school bus, the two boys set fire to the house. They then proceeded to school.

The Juvenile Court heard evidence to this effect at the transfer hearing on January 20, 1960, which was attended by petitioner, his parents and paternal grandmother, and his two attorneys. The Juvenile Court also received a written report on petitioner's mental, social and physical health from the County Department of Public Welfare as ordered by the Court pursuant to Va.Code § 16.1–176(b) (1950).

The report contained analyses of petitioner's physical and mental health plus a social history and school report. Petitioner was found to be nine days short of his fifteenth birthday on the day of the crime and in good health. His teacher described him as "courteous," "playful and full of fun," and reported that petitioner, although "shy and soft-spoken," was generally well liked. His school work was described as poor. The psychiatrist who conducted the initial psychiatric interview, Dr. Joseph W. Coxe, found petitioner "well oriented and able to answer factual questions about his life from age 5 up to the present." Dr. Coxe noted that petitioner's responses did not "in any way fit the usual picture of a psychotic or even severely neurotic personality," and, aside from petitioner's "slightly retarded intelligence," Dr. Coxe felt there was no organic basis for his behavior nor any paranoic or schizophrenic alteration of his personality.

Dr. W. R. Reese, who administered psychological tests to petitioner, accorded him a full scale I.Q. score of 82, finding most of his abilities at around the 11½ year level. The psychological tests revealed further that petitioner was "too rigid, dependent, and yet, over-critical of his parents, and [had] not developed sufficient control of adolescent impulses." The psychologist concluded that "[t]here is a possibility that he will turn out as a productive citizen in the future—even though the past has not given him sufficient controls and strengths."

With reference to the murder, petitioner freely admitted his planning and commission of the crime to the examining doctors, although he exhibited "some feelings of guilt." Dr. Coxe reported that the only sign of emotion surfaced when petitioner was asked about the possibility of punishment for his actions. Dr. Coxe remarked more than once that petitioner "was not telling the whole story" concerning his motives for murdering his grandfather. Dr. Reese noted that petitioner exhibited a "strong fear of punishment." The report stated also that there was strong feeling in the community concerning this crime due to the fact that petitioner's grandfather was

well-respected and very popular in the community. The welfare agency concluded with a recommendation that petitioner be committed to the Thorpe Home for Negro Boys.

### III.

■ For purposes of this reconstructed waiver hearing, petitioner argues that only one factor—the seriousness of the alleged offenses—supports a waiver of jurisdiction, and that other factors such as petitioner's age and his amenability to rehabilitation compel a finding that waiver is unreasonable. The Court concludes, however, that on the basis of information which competent counsel might have presented and in fact did present to the Juvenile Court, and when judged by the standards relevant to waiver in 1960, a reasonable judge would probably have certified petitioner for adult trial in the Circuit Court. Supporting this determination are the factors of (1) serious and aggravated offenses, (2) the willful, premeditated manner by which petitioner committed the murder, (3) probable cause to believe petitioner was guilty, (4) a finding that petitioner was not psychologically imbalanced or confused about the nature of his actions, (5) strong public reaction to the crime.

The Court adds that a contrary decision by a juvenile court judge to retain jurisdiction over the petitioner would not have been unreasonable, and indeed might have been, in this Court's view, preferable. The duty of the Court, on habeas corpus review, however, is not to second-guess Juvenile Court Judge Eacho, but only to determine whether a reasonable judge would have concurred in his 1960 certification. *Inge v. Slayton, supra* at 354. Having so found, the Court will allow petitioner's 1960 convictions, as well as the recidivist sentence based thereon, to stand.